## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

_____

| | |
|---|---|
| **Jane Doe,** | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | )  Civil No. _____ |
| **Old Dominion University**, | ) |
| | ) |
| Defendant. | ) |

_____

## COMPLAINT

Plaintiff Jane Doe[1] hereby brings this action against Defendant Old Dominion University ("ODU") seeking redress for ODU's utter failure to prevent a foreseeable sexual assault committed against Ms. Doe on October 12, 2014. For the unimaginable emotional, physical and other suffering she has endured resulting from ODU's conduct, Ms. Doe asserts claims under Title IX of the 1972 Amendments to the Higher Education Act, to correct unlawful discrimination on the basis of sex committed by ODU against Plaintiff Doe to subject her to an ongoing hostile educational environment after an on-campus sexual assault; under 42 U.S.C. § 1983 for deprivation of her Fourth Amendment right under the U.S. Constitution committed by ODU against Plaintiff Doe to subject her to unlawful seizure; and under Virginia law, to provide appropriate relief to Ms. Doe for intentional infliction of emotional distress, premises liability, negligence, and negligent infliction of emotional distress to result in further personal injury to Plaintiff Doe after the sexual assault.

_____

[1] Contemporaneously with this Complaint, Plaintiff has filed a motion to proceed under pseudonym that sets forth the legal and factual authority for proceeding under a pseudonym.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 because Plaintiff's claims assert a federal question and this Court has supplemental jurisdiction over the state-law claims.

2. This Court has personal jurisdiction over Defendant pursuant to Federal Rule of Civil Procedure 4(k)(1)(a) and Virginia Code Ann. § 8.01-328.1 because Defendant conducts business in this jurisdiction and because the conduct giving rise to this cause of action occurred in this judicial district.

3. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions alleged in this complaint occurred within this district.

## THE PARTIES

4. Plaintiff Ms. Doe was an 18-year-old freshman scholarship student enrolled at ODU when an on-campus visitor, referenced herein as T.W., sexually assaulted and raped her on-campus in her room at Virginia House, an ODU residence hall, on or about October 12, 2014.

5. Defendant ODU is a public research institution organized and existing under the laws of the Commonwealth of Virginia with its principal office in this judicial district. ODU also receives federal funding from the U.S. Department of Education to provide educational programs and activities within the meaning of Title IX, 20 U.S.C. §§ 1681 *et seq*.

## FACTS COMMON TO ALL COUNTS

6. In fall 2014, Ms. Doe was a freshman enrolled in the ODU Honors College Program. Ms. Doe resided at Virginia House, an on-campus residence owned and managed by ODU.

7. Around that time, ODU had notice that its campus police force was understaffed and operating at approximately forty percent to create a "safety hazard for the campus, community, and officers." *See* Exhibit 1.

8. Late on the night of October 11, 2014, Ms. Doe met T.W. during an on-campus party at The District Apartments. Upon information and belief, T.W. was a frequent visitor on ODU's campus.

9. The District Apartments is a residential apartment complex, located at 1037 West 39th Street, Norfolk, Virginia, 23508, that primarily caters to ODU students.  Upon information and belief, ODU owns and/or manages the complex.

10.  Ms. Doe attended the October 11 party with two of her friends, P.G. and J.J.  While at the party, a fellow student named R. started dancing with Ms. Doe.  This exchange ended when R. became very sexually aggressive with Ms. Doe.

11.  Ms. Doe then met T.W., who was a friend of R. The two talked for some time at the party.  Towards the end of the party, Ms. Doe and her friend J.J. went to R.'s apartment, which is also located in The District Apartments, with a group of students to continue drinking.  T.W. went with them.  While at R.'s apartment, T.W. continued to talk to Ms. Doe.

12.   During this time, R. was very intoxicated and started to make Ms. Doe uncomfortable by insisting that she sit on his lap in exchange for the drinks he had provided her. T.W. then offered to say something to R. to get him to stop harassing Ms. Doe.

13. As a result of T.W. intervening, R. stopped harassing Ms. Doe. T.W. later offered to walk both Ms. Doe and another female ODU student, J.J., back from the on-campus party at The District Apartments to their respective on-campus residence halls.  Given his previous efforts to keep Ms. Doe safe, she accepted his offer to walk the women safely home.

14. T.W. first escorted J.J. to her on-campus residence and then he escorted Ms. Doe to Virginia House.  Upon arrival, Ms. Doe offered to let T.W. sleep on a couch in the communal area because of the late hour and the distance he had walked.  Instead of doing so, T.W. entered her bedroom undressed. Ms. Doe lost consciousness, due to the late hour and having been intoxicated from drinking, when T.W. proceeded to undress her and insert his penis into her vagina without consent to rape her while she was unconscious.  He then flipped her over to insert his penis into her anus, which caused her to regain some consciousness and she cried out in pain as he proceeded to forcibly rape her anally, causing her to bleed.  During the sexual attack, she continually protested by shaking her head "no" and crying while trying to physically resist, but T.W. persisted in his violent rape of Ms. Doe.  T.W. then withdrew his penis from her anus to ejaculate before leaving Ms. Doe crying on the bed while he went to use the bathroom.

15. After the attack, Ms. Doe lay in the bed crying and bleeding while in shock. T.W. then returned from the bathroom to blankly stare at Ms. Doe and further scare her given his complete lack of remorse despite her clear distress. Ms. Doe then fled to a communal bathroom in Virginia House with her phone in hand to call for help.  She was crying hysterically, in severe physical pain, and suffering severe emotional anguish when she noticed that she was bleeding from her vagina and anus as a result of the sexual attack. Ms. Doe then took a photo on her cell phone of the blood in her underwear.

16. While in the bathroom, Ms. Doe used her cell phone to frantically call fellow students at ODU for help.  Ms. Doe sought their assistance because ODU did not have any personnel stationed at the Virginia House to assist students at that time of night.

4

17. Ms. Doe eventually reached a friend and fellow ODU student, J.H., who arrived at Virginia House and demanded that T.W. leave Ms. Doe's bedroom.  T.W. refused to respond and had locked himself in Ms. Doe's room.

18. J.H. then recruited two other ODU students to help him forcefully remove T.W. from Ms. Doe's room, which occurred at approximately 4:00 a.m. During this removal, T.W. identified himself to J.H. and the other students by a false name.

19. During this time, no ODU personnel or security were stationed at Virginia House to assist J.H. and the other ODU students in removing T.W.

20. Once T.W. was finally removed from Ms. Doe's room, Ms. Doe collected her clothes and personal effects before returning with J.H. to the safety of his off-campus apartment.  At his apartment, fellow ODU student P.G. was present and talked with Ms. Doe about her options to report the rape and sexual assault.  Ms. Doe decided to first report the rape to her mother and sister, who both encouraged her to contact a local rape crisis center.  Upon contacting the rape crisis center, an advocate made an appointment for Ms. Doe to get a forensic examination or "PERK kit" at Norfolk General Hospital and also encouraged her to call the police.

21. In the early morning hours of October 12, 2014, Ms. Doe called 911 to report the sexual assault. The 911 operator routed Ms. Doe's call to the ODU Police Department, and the responding dispatcher requested that Ms. Doe wait outside the Success Center, which is an on-campus building, for ODU police to arrive and pick her up.  P.G. agreed to accompany Ms. Doe to the Success Center so she would not have to wait alone and outside on her own.

22. Upon picking up Ms. Doe and P.G., the ODU Police did not immediately take Ms. Doe to Norfolk General Hospital to receive emergency medical assistance or to have forensic evidence collected, despite the fact that Ms. Doe already had an appointment for a PERK kit and

she had reported bleeding from the rape as well as shown ODU officers the photo she took of her bloodied underwear. Instead, the ODU Police took Ms. Doe to an on-campus police department and held her for approximately eight hours.  During this time, Ms. Doe was subjected to intense interrogation despite her ongoing need for immediate medical assistance.

23. At no point did ODU issue a timely warning to the campus community regarding the report of an on-campus rape at Virginia House, as provided for in the federal campus safety legislation known as the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f), despite the suspect still being at large to pose a risk to other students.

24. At the ODU Police Department, Ms. Doe provided an initial statement about the rape and helped to identify T.W. by providing a photo and description of the assailant's vehicle.

25. Upon information and belief, ODU Police also collected evidence of the rape from Ms. Doe's room at Virginia House, which consisted of bloodied sheets from her bed where the rape occurred.  ODU Police also located T.W. on-campus and brought him in voluntarily for questioning at the police department where they were still holding Ms. Doe.

26. After ODU Police brought in T.W. for questioning, ODU Detectives Robert Taylor and Christopher S. Jones, through a show of authority, unlawfully seized Ms. Doe by requiring her to stay in a conference room in the campus police department, separate from her family members and her assigned YWCA Victim Advocate, to limit her freedom for several hours. Specifically, after questioning T.W., ODU Detective Taylor entered the conference room, threw a stack of papers down, and demanded that Ms. Doe's family and her YWCA Victim Advocate leave the conference room so they could continue to interrogate Ms. Doe alone.

27. During ODU's detainment of Ms. Doe, ODU Detectives Taylor and Jones interrogated her on and off for hours while expressing open skepticism about Ms. Doe's report of sexual assault and rape, despite having found physical evidence in her room to corroborate the report and knowing that further evidence could be made available via a PERK kit. Even after forcing Ms. Doe to recount the assault and rape in detail repeatedly, and police having collected physical evidence of bloodied sheets from the crime scene itself, Detective Taylor repeatedly voiced skepticism by claiming that he "just [didn't] see the crime here."

28. Throughout the detainment and interrogations, Ms. Doe was continually denied food, water, the use of a bathroom, or access to any emergency medical assistance or forensic nurse examination to impede the timely collection of forensic evidence regarding the rape. This occurred even though Ms. Doe asked for water on several occasions.

29. Upon information and belief, during the same time that Ms. Doe was unlawfully seized without access to food or water, ODU Police informed her that they were providing T.W. with a drink and a meal during his voluntary questioning.

30. Upon information and belief, after minimal questioning of T.W., the ODU Police allowed him to leave while continuing to unlawfully hold Ms. Doe, who had remained separated from her YWCA Victim Advocate and family for hours.

31. Upon information and belief, ODU Police had sufficient testimony and evidence to hold T.W. on probable cause of rape and sexual assault, but instead permitted T.W. to leave campus and the Commonwealth of Virginia without any interim remedies or safety measures, such as a no trespass order, no contact order, or similar protective measure in place to prohibit his ongoing access to ODU's campus or Ms. Doe's residence in Virginia House. Through failing

to take such interim remedies or safety measures, ODU left Ms. Doe scared and alone on campus without any support or protection after she bravely reported a violent sexual attack.

32. After almost eight hours of holding Ms. Doe, ODU Detective Jones finally escorted Ms. Doe and her family to the Chesapeake Forensics Consultants to have Ms. Doe receive emergency medical assistance and the PERK kit examination.

33. Prior to Ms. Doe receiving emergency medical assistance, the ODU Police promised to seek a protective order against T.W. on her behalf while she underwent the collection of forensic evidence.  ODU Police assured Ms. Doe and her family that this step could be taken without her being present.

34. After three hours of a forensic nurse examination at the Chesapeake Forensics Consultants to collect forensic evidence of the rape, the results showed that Ms. Doe had sustained injuries consistent with a violent rape to include swelling, pain, tears, and bleeding from her vagina and anus.

35. Despite this evidence, after the forensic nurse examination concluded, ODU Detective Jones informed Ms. Doe and her family that ODU Police would no longer be obtaining a protective order against T.W.

36. At no point did ODU Detective Jones or any other member of the ODU Police Department discuss with Ms. Doe her rights and option to have ODU provide interim remedies or safety measures, such as a no trespass order, no contact order, or similar protective order against T.W. to prohibit him from accessing ODU's campus or Ms. Doe's residence hall at Virginia House.

37. Later that week, ODU Detective Jones called Ms. Doe to inform her that the ODU Police had declined to pursue charges for rape or sexual assault by claiming a "lack of probable cause."

38. On October 20, 2014, Ms. Doe's father, a former federal law enforcement officer, emailed ODU Detective Jones to discuss the criminal complaint and investigation as well as to inquire if ODU administration had been alerted about the rape to provide the appropriate interim remedies or safety measures to his daughter, Ms. Doe.  Ms. Doe and her family were deeply concerned for her safety because T.W. knew where she lived on ODU's campus.

39. ODU Detective Jones never responded to this October 20, 2014 email.

40. On October 24, 2014, Ms. Doe's father emailed ODU Detective Jones, and this time copied ODU Police Chief Rhonda Harris, again requesting information about the criminal complaint and investigation as well as inquiring as to whether ODU administration had been alerted about the on-campus rape to provide appropriate interim measures to his daughter, Ms. Doe.  Chief Harris responded to this email by arranging a phone call with Ms. Doe's father.

41. During the phone call between Chief Harris and Ms. Doe's father, Chief Harris promised to undertake a "supervisory review" of the criminal complaint and investigation as well as to request a prosecutorial review by Assistant Commonwealth Attorney ("ACA") Trish O'Boyle.

42. Despite repeated requests by Ms. Doe's father, the ODU Police and Chief Harris refused to contact ODU administration to report the on-campus rape and sexual assault to ODU administration to ensure they provided Ms. Doe with appropriate interim remedies and safety measures.  Instead, the ODU Police and Chief Harris required Ms. Doe to reach out on her own to ODU's administration to report the sexual assault and rape again.

43. On October 24, 2014, Ms. Doe's father attempted to email and call ODU Dean Don Stansberry in the Dean of Students' Office to request appropriate interim remedies and safety measures for his daughter, Ms. Doe.

44. After several attempts, Ms. Doe's father finally spoke with Dean Stansberry, who denied him any information about Ms. Doe's rights and options regarding interim remedies, safety measures, and available accommodations under Title IX and the Clery Act, but instead routed him to another ODU administrator to repeat his inquiry.

45. On October 29, 2014, Ms. Doe's father again emailed Dean Stansberry asking for interim remedies, safety measures, and available accommodations for his daughter, Ms. Doe. Later that day Dean Stansberry responded by providing information on housing and academic accommodations and available assistance with health needs, all with the caveat that Dean Stansberry would like the Doe family's consent to say that ODU was "working with the family" in response to media and other inquiries about the sexual assault. Ms. Doe's father agreed that ODU could issue such a press statement in order to secure assistance for his daughter that he had already repeatedly requested. Despite this agreement, Dean Stansberry subsequently failed to follow up with Ms. Doe or her family to ensure any offer of accommodations or assistance had been provided by ODU.

46. On November 4, 2014, ODU received additional media inquiries regarding Ms. Doe's rape case. Dean Stansberry then emailed Ms. Doe directly and Ms. Doe responded that she had not yet received housing accommodations and that her student account was on hold due to ongoing issues related to the lack of accommodations provided to her after the sexual assault. Despite having this information, Dean Stansberry did not follow up on any of Ms. Doe's concerns to ensure ODU was assisting or supporting her after the sexual assault.

47. On November 6, 2014, the ODU Office of Institutional Equity and Diversity sent an email to Ms. Doe stating that the Equity & Equal Opportunity & Affirmative Action Director and Deputy Title IX Coordinator, S. Lanay Newsom, was responsible for handling sexual harassment and misconduct complaints and therefore could offer her accommodations as a victim of sexual assault.  Within minutes of ODU sending this email, the Office of Institutional Equity and Diversity sent another email retracting this offer of assistance to continue depriving Ms. Doe of any accommodations or assistance from the Title IX Coordinator or the Office of Institutional Equity and Diversity.  *See* Exhibit 2.

48. On November 17, 2014, Ms. Doe's father reached out to ACA O'Boyle about the prosecutorial review of the rape case and learned that the ODU Police had only just sent the case up to the Commonwealth Attorney's Office in Norfolk for review, which was a significant amount of time after the October 12 sexual assault and rape had occurred.

49. Due to ODU's failure to provide Ms. Doe with appropriate accommodations after the rape, Ms. Doe had her counselor, E. O'Neill Hunter of the YWCA of South Hampton Roads, request accommodations due to her PTSD systems in an effort to secure disability-based accommodations after the rape.  Counselor Hunter sent this request for accommodations to ODU on November 10, 2014.

50. In response to Ms. Hunter's letter, on November 13, 2014, ODU Assistant Director Sarah Chapman confirmed with Ms. Doe that she could receive housing accommodation for her disability, but only if she paid more than she was currently paying for housing to ODU.

51. On December 3, 2014, right before final exams for the semester, the ODU Office of Educational Accessibility emailed Ms. Doe a form requiring her to meet individually with each and every ODU faculty member teaching her that semester to disclose the rape and her disability

before ODU would approve any subsequent academic accommodations as offered by each individual faculty member.  ODU also notified Ms. Doe that she would have to fill out these forms each semester in order to continue receiving academic accommodations.  Due to these invasive and tedious disclosure requirements, Ms. Doe opted to have the ODU Accessibility Center notify all of her ODU instructors about the rape and resulting disability on her behalf.

52. On December 23, 2014, the ODU Honors College sent an email to Ms. Doe noting a drop in her GPA, which was a direct result of the lack of academic accommodations provided to her after the on-campus sexual assault.  This email stated that the change in Ms. Doe's GPA disqualified her for receiving her scholarship at ODU, effective immediately.

53. On January 7, 2015, after a local journalist had reached out to ODU asking questions about the on-campus sexual assault and rape again, ODU Dean Stansberry called Ms. Doe's father.  During this call, Dean Stansberry inquired about Ms. Doe's ongoing need for accommodations, but again failed to ensure any ongoing needs for accommodation or support were in fact provided by ODU.

54. On January 8, 2015, Dr. Maria Van der Meid sent a written diagnosis to ODU stating that Ms. Doe was suffering from acute stress and general anxiety disorder along with depression and insomnia due to the on-campus rape.  This written diagnosis also came with a request that ODU provide Ms. Doe with housing accommodations for her resulting disabilities.  Despite this, ODU did not respond to Ms. Doe with an offer for housing accommodations.

55. Based upon ODU's refusal to provide meaningful accommodations after the rape and sexual assault, or to provide any information about available interim remedies or safety measures, Ms. Doe was forced to retain legal counsel.

56. Only after extensive back-and-forth exchanges between Ms. Doe's counsel and ODU officials did ODU finally respond with information about no trespass orders on February 3, 2015. ODU claimed that ODU Detective Jones had given a verbal no trespass order to T.W. back in October 2014 and that ODU had issued him a written no trespass order back on January 9, 2015. Until her attorney reached out to request this information, ODU had not given any notice to Ms. Doe or her family at any point in time about having issued either order.  Accordingly, between October 12, 2014 and February 3, 2015, Ms. Doe and her family were given no assurance that ODU had made any efforts to issue a no trespass order against T.W. to prohibit him from returning to campus or her residence hall at will.

57. According to the 2014 Annual Security Report issued by ODU: "Old Dominion University has procedures in place that serve to be sensitive to those who report sexual assault, domestic violence, dating violence, and stalking, including written notification about their right to file criminal charges as well as the availability of counseling, health, mental health, victim advocacy, legal assistance, visa and immigration assistance and other services on and/or off campus as well as additional remedies to prevent contact between a victim and an accused party, such as housing, academic, transportation and working accommodations, if reasonably available."

## CLAIMS FOR RELIEF

### COUNT ONE
*Title IX of the Education Amendments Act, 20 U.S.C. §§ 1681* **et seq.**

58. Plaintiff incorporates by reference the allegations of facts contained in the previous paragraphs as if fully set forth herein.

59. Defendant ODU is a public research and educational institution in receipt of federal funding from the U.S. Department of Education and thus is subject to the requirements of Title IX of the Education Amendments Act under 20 U.S.C. §§ 1681 *et seq.*

60. At all relevant times, Plaintiff was an enrolled student at ODU.

61. During the early morning of October 12, 2014, Ms. Doe provided ODU with actual notice that T.W. committed a rape and sexual assault against her on-campus in Virginia House.

62. ODU had an obligation to address Ms. Doe's report of sexual assault against T.W. because rape and sexual assault constitute severe and objectively offensive sexual harassment, which is a form of prohibited sex-based discrimination under Title IX.

63. ODU also had an obligation to address Ms. Doe's report of sexual assault against T.W. because the rape and sexual assault were part of a pervasive pattern of sexual harassment that ODU had actual knowledge was occurring routinely on-campus within its residence halls.

64. ODU had substantial control over T.W. because he was an on-campus visitor before and during the time of the sexual assault and rape.  ODU also had substantial control over T.W. after the sexual assault because he remained an on-campus visitor when Ms. Doe reported the sexual assault and rape to ODU Police. The ODU Police were able then to locate T.W. and ask him to come in voluntarily for questioning at the on-campus police department after Ms. Doe reported the sexual assault and rape.

65. After receiving actual notice of the sexual assault, ODU had an obligation to provide Ms. Doe with prompt and equitable interim remedies to ensure her ongoing safety on campus as well as continued access to education programs and activities through the provision of reasonable academic, housing, and other reasonably available accommodations.

66. Despite its obligations, ODU showed deliberate indifference to the rape and sexual assault of Ms. Doe by failing to provide her with prompt and equitable interim remedies in the form of academic and housing accommodations to effectively deny and/or limit her ability to participate in or to receive benefits, services, or opportunities from ODU's educational programs or activities. *See* Exhibit 2.

67. ODU showed deliberate indifference to the rape and sexual assault of Ms. Doe by failing to provide her with prompt and equitable safety measures in the form of a no trespass order, no contact order, or other safety measures to prohibit T.W. from his ongoing ability to access the ODU's campus and Ms. Doe's residence at Virginia House.

68. As a result of ODU's deliberate indifference to Ms. Doe's report of rape and sexual assault, she suffered an ongoing hostile educational environment at ODU to effectively deny her educational access and opportunities.

## COUNT TWO
### *Violation of Fourth Amendment, 42 U.S.C. § 1983*

69. Plaintiff incorporates by reference the allegations of facts contained in the previous paragraphs as if fully set forth herein.

70. At all relevant times, Detectives Taylor and Jones were employees of ODU and, upon information and belief, sworn police officers for the Commonwealth of Virginia.

71. At all relevant times, Detectives Taylor and Jones acted under color of law as on-duty police officers for ODU.

72. ODU Detectives Taylor and Jones unlawfully seized Ms. Doe for several hours through a show of authority when they required her to stay in a conference room at the on-campus police department without the ability to leave, access food or water, or receive

emergency medical assistance despite knowing that she was bleeding from the injuries sustained during the rape.

73. Upon information and believe, ODU Detectives Taylor and Jones lacked probable cause to detain Ms. Doe as she was a victim of a violent sexual attack, not a suspect of a crime. Furthermore, by holding Ms. Doe to deny timely collection of forensic evidence regarding the rape, ODU Detectives Taylor and Jones instead allowed T.W. to leave both campus and the Commonwealth of Virginia before obtaining forensic evidence sufficient to provide probable cause to hold or arrest him.

74. By detaining Ms. Doe in the police department conference room, ODU, a public institution of higher education, by and through its agents, Detectives Taylor and Jones, deprived Ms. Doe of her Fourth Amendment right to be free from unlawful seizure.

75. As a direct and proximate cause of ODU's actions, Plaintiff was deprived of her liberty at a time when it was critical for her to seek immediate medical assistance and collection of forensic evidence and this caused her to needlessly suffer additional severe emotional distress after the rape and sexual assault.

### COUNT THREE
### *Premises Liability*

76. Plaintiff incorporates by reference the allegations of facts contained in the previous paragraphs as if fully set forth herein.

77. ODU offers on-campus housing at Virginia House for students enrolled in its Honors College Program.

78. Starting in August 2014, Ms. Doe was a student enrolled in the ODU Honors College Program who resided at Virginia House.

79. As a student resident of Virginia House, ODU owed Ms. Doe a duty of ordinary care to prevent criminal acts of third persons that it could have reasonably foreseen or anticipated.

80. ODU could have reasonably foreseen and anticipated a sexual assault occurring in Virginia House due to the high rates of on-campus sexual assaults specifically occurring within residence halls, which entails, at minimum, three rapes in 2009, six rapes in 2010, four rapes in 2011, three rapes in 2013, and thirteen rapes in 2014, pursuant to ODU's Annual Security Reports.

81. ODU breached its duty of ordinary care by failing to station any campus personnel within Virginia House to monitor access by non-student visitors, such as T.W., or to protect and aid ODU students after an on-campus sexual assault, such as Ms. Doe.

82. As a direct and proximate cause of ODU's breach of its duty of ordinary care, Plaintiff was sexually assaulted and suffered physical injuries, severe emotional distress, and other pecuniary harms to be established at trial.

## COUNT FOUR
### *Intentional Infliction of Emotional Distress*

83. Plaintiff incorporates by reference the allegations of facts contained in the previous paragraphs as if fully set forth herein.

84. On behalf of ODU, Detectives Taylor and Jones intentionally and recklessly engaged in outrageous and intolerable conduct and inflicted severe emotional distress upon Ms. Doe, a victim of rape, when they isolated her in a locked interrogation room to separate her from an assigned victim advocate and her family for several hours immediately after the rape and sexual assault occurred, which was still causing her to bleed from both her vagina and anus.  Detectives Taylor and Jones intentionally engaged in this conduct as part of their duties as officers for

ODU's Police Department. Detectives Taylor and Jones then proceeded to conduct multiple back-to-back interrogations of Ms. Doe without her victim advocate present, which they knew or should have known would likely result in Ms. Doe suffering severe emotional distress in the wake of a sexual assault and rape.  Such conduct by ODU, by and through its agents, is outrageous and intolerable in that it offends against the generally accepted standards of decency and morality and no reasonable person should be expected to endure it.

85. On behalf of ODU, Detectives Taylor and Jones intentionally and recklessly engaged in outrageous and intolerable conduct and inflicted severe emotional distress upon Ms. Doe, a victim of rape, by depriving her of access to emergency medical assistance for several hours immediately after the rape and sexual assault occurred, which was still causing her to bleed from both her vagina and anus.  Ms. Doe had alerted ODU Police to the injuries that she sustained during the rape and even provided a picture of her bloodied underwear.  Despite this notice of her injuries, as well as notice that she already had an appointment to receive care at Norfolk General Hospital, ODU intentionally denied her emergency medical care to instead hold her for hours while Detectives Taylor and Jones conducted back-to-back interrogations that they knew or should have known would likely result in Ms. Doe suffering severe emotional distress and further physical injury. Such conduct by ODU, by and through its agents, is outrageous and intolerable in that it offends against the generally accepted standards of decency and morality and no reasonable person should be expected to endure it.

86. On behalf of ODU, Detectives Taylor and Jones intentionally and recklessly engaged in outrageous and intolerable conduct and inflicted severe emotional distress upon Ms. Doe, a victim of rape, by denying her access to food, water, and the use of the bathroom while they isolated her from her victim advocate and family as well as held her in a locked conference room

to conduct back-to-back interrogations.  During these interrogations, Detectives Taylor and Jones intentionally inflicted emotional distress upon Ms. Doe by informing her that ODU had provided T.W. with food and drink in a nearby room during his voluntary interview while denying her access to food and water. Detectives Taylor and Jones knew or reasonably should have known that this conduct would inflict severe emotional distress upon Ms. Doe as it demonstrated that ODU was treating a reported rapist better than her, the reported rape victim.  Such conduct is outrageous and intolerable in that it offends against the generally accepted standards of decency and morality and no reasonable person should be expected to endure it.

87. On behalf of ODU, Detectives Taylor and Jones intentionally and recklessly engaged in outrageous and intolerable conduct and inflicted severe emotional distress upon Ms. Doe, a victim of rape, by depriving her of access to the collection of forensic evidence for several hours immediately after the rape sexual assault occurred, which was still causing her to bleed from both her vagina and anus.  As part of their duties with ODU, Detectives Taylor and Jones knew that the prompt collection of forensic evidence could support Ms. Doe's report of rape and provide sufficient probable cause to arrest T.W., but instead they intentionally denied her timely access to receiving such evidence collection services, conducted back-to-back interrogations while expressing open and repeated skepticism of her criminal complaint,  and informed her that they had let T.W. go from campus and the Commonwealth of Virginia. Detectives Taylor and Jones knew or should have known that this conduct would likely have caused Ms. Doe to suffer severe emotional distress as a result of such outrageous and intolerable conduct that offends against the generally accepted standards of decency and morality and which no reasonable person should be expected to endure.

88. As a direct and proximate result of these actions by Detectives Taylor and Jones, acting as agents of ODU, Plaintiff suffered severe emotional distress, which includes diagnoses of acute stress reaction, generalized anxiety disorder, depression, as well as insomnia, nightmares, anxiety, vomiting, nausea, dehydration, light-headedness, paranoia, fear, and ongoing digestive issues.

## COUNT FIVE
### *Negligence Infliction of Emotional Distress*

89. Plaintiff incorporates by reference the allegations of facts contained in the previous paragraphs as if fully set forth herein.

90. On behalf of ODU, Detective Jones negligently inflicted emotional distress upon Ms. Doe, a victim of rape, by failing to seek a protective order on her behalf after stating he would do so, and by failing to provide her with any information about whether ODU had issued or could issue any no trespass order to prohibit T.W. from returning to ODU's campus or her residence at Virginia House.

92. As a direct and proximate result of these actions by ODU, by and through its agent, Detective Jones, Plaintiff suffered emotional distress so severe it manifested in physical illness and injury and resulted in pecuniary loss.  Specifically, Plaintiff suffered acute stress reaction, generalized anxiety disorder, and depression as well as insomnia, nightmares, crying fits, vomiting, anxiety, loss of appetite, weight-loss, panic and/or anxiety attacks paranoia, fear, and incurred costs that included moving expenses, medical care, ongoing counseling, therapist visits, and the installation of security cameras at her residency.

## COUNT SIX
### *Negligence*

93. Plaintiff incorporates by reference the allegations of facts contained in the previous paragraphs as if fully set forth herein.

94. As a residential student at ODU, Ms. Doe had a "special relationship" with ODU such that ODU owed Ms. Doe a heightened duty of care to protect her from foreseeable risks of harm.

95. ODU also owed Plaintiff a duty of care as an owner and operator of the residence hall and campus premises.

96. ODU breached these duties of care by, among other things, failing to provide adequate security to protect Plaintiff from the risk of harm.

97. As a direct and proximate cause of ODU's breach of its heightened duty of care, Plaintiff was sexually assaulted and suffered physical injuries, emotional distress, and other pecuniary harms to be established at trial.

## REQUESTS FOR RELIEF

WHEREFORE Plaintiff Doe respectfully requests that this Court:

(a) Grant compensatory and punitive damages in an amount that exceeds $75,000.00, to be proven at trial;

(b) Order preliminary and permanent injunctive relief that: (1) requires ODU to provide annual training to campus police on trauma-informed responses and investigative strategies for victim of sexual violence; (2) requires ODU Police to abide by Virginia state law, which provides victims the right to be treated with dignity, respect, fairness, and sensitivity, *see* Va. Const. Art. 1, § 8-A(2) & Va. Code § 19.2-11.01(A); (3) requires ODU and all of its campus security authorities to transport victims of sexual assault and rape immediately to emergency medical assistance at a hospital or medical center that also provides for the collection of forensic evidence; (4) requires ODU to terminate the employment of ODU Police Chief Harris and hire a

replacement who is qualified and highly trained in dealing with victims of sexual assault and rape; (5) requires ODU to send out timely warnings to ODU students and members of the campus community when sexual assaults or rapes occur on campus and in residence halls; (6) requires ODU Police to inform all victims of sexual assault and rape of their option to receive a protective order, no trespass order, no contact order, or other related safety measures and to provide all reasonable and necessary assistance to secure such orders on behalf of the victim; (7) requires ODU to allow all victims access to a victim advocate, attorney or advisor of choice during all meetings regarding on-campus sexual assault, whether with ODU administration or ODU Police; (8) requires ODU to develop a memorandum of understanding that would allow victims of sexual assault and rape to report to Norfolk Police; (9) requires ODU to provide immediate and ongoing joint annual trainings with ODU Police and ODU administration on coordinating a campus response to instances of sexual assault and rape on-campus or involving ODU students in compliance with all applicable federal and state laws; (10) requires ODU to develop a single, comprehensive campus-based response to ensure victims of sexual assault and rape receive immediate interim measures regarding safety measures of a no contact order or no trespass order, as appropriate, and regarding academic and housing accommodations; (11) requires ODU to have a security officer or similar personnel in each residence hall on campus 24 hours a day and seven days a week who are trained to prevent, intervene and respond to instances of sexual assault and rape in compliance with all applicable federal and state law as well as best practices for trauma-informed care; (12) requires ODU to update all of its on-campus residence halls with an emergency alert system that will automatically call security staff when used; (13) requires ODU's security personal stationed in each residence hall to check in visitors and to assist students in removing unwelcome visitors upon request as well as to update its campus

policies to that effect; (14) requires ODU to keep a vacant room available in each residence halls for students to use in emergencies as a safe room and as a temporary housing accommodation without any additional cost to the student; (15) requires ODU to mandate sexual assault and rape prevention education classes for all incoming students either before or during freshmen or transfer student orientation; (16) requires ODU to update its academic policies to ensure student victims of sexual assault and rape are not limited in the amount of exams they can retake, but are instead accommodated as needed in compliance with applicable federal and state law; (17) requires ODU to cover all medical and mental health expenses for victims of on-campus sexual assault and rape; (18) requires ODU to allow unlimited on-campus counseling and therapy services for enrolled students who are victims of sexual assault or rape; (19) requires ODU to update its housing policies to prevent increased housing charges for victims of sexual assault and rape who request and receive reasonable housing accommodations; (20) requires ODU to provide an optional in-person meeting for every victim of sexual assault and rape with the Title IX Coordinator to learn about available support resources on- and off-campus for survivors, as well as to learn about all available options regarding interim measures and reasonable accommodations; and (21) requires ODU police to provide immediate notice to ODU's Title IX Coordinator of any reported sexual assault or rape and to provide reporting victims with written information about their rights and options to access resources and accommodations on campus or in the community, as required by applicable federal and state law.

(c) Grant all allowable attorneys' fees, costs, and expenses regarding this lawsuit; and

(d) Grant all other and further relief that justice may require.

**JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial on all claims and issues so triable.

DATED this 6th day of January 2017.

Respectfully submitted,

_____/s/_____
/s/ Carly N. Mee, Esq.
Virginia Bar #90912
Attorney for Plaintiff
SurvJustice, Inc.
1629 K Street NW, Suite 300
Washington D.C. 20006-1631
Telephone: (202) 600-7839
Facsimile: (202) 478-2822
Carly.Mee@survjustice.org

_____/s/_____
Steven J. Kelly, Esq. (*pro hac vice* pending)
Attorney for Plaintiff
Silverman, Thompson, Slutkin, & White, LLC
201 North Charles Street, 26th Floor
Baltimore, Maryland 21201
Telephone: (410) 385-2786
Facsimile: (410) 547-2432
SKelly@mdattorney.com

_____/s/_____
Laura L. Dunn, Esq. (*pro hac vice* pending)
Attorney for Plaintiff
SurvJustice, Inc.
1629 K Street NW, Suite 300
Washington D.C. 20006-1631
Telephone: (202) 600-7839
Facsimile: (202) 478-2822
Laura.Dunn@survjustice.org

24

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
(Norfolk Division)

| | | |
|---|---|---|
| **Jane Doe,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Civil No. _____ |
| **Old Dominion University,** | ) | |
| | ) | |
| _____Defendant._____ | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on the 6 day of January, 2017, I will electronically file the foregoing

with the Clerk of Court using the CM/ECF system, which will then send a notification of such

filing (NEF) to the following:

> Rhodes B. Ritenour
> Deputy Attorney General, Civil Litigation Division
> Office of the Attorney General
> 900 East Main Street
> Richmond, VA 23219
> RRitenour@oag.state.va.us

And I hereby certify that I will mail the document by U.S. mail to the following non-

filing user:

> Earl Nance, Esquire
> Assistant Attorney General & University Counsel
> 214 Koch Hall
> Norfolk, VA 23529

_____/s/_____
/s/ Carly N. Mee, Esq.
Virginia Bar #90912
Attorney for Plaintiff
SurvJustice, Inc.
1629 K Street NW, Suite 300

Washington D.C. 20006-1631
Telephone: (202) 600-7839
Facsimile: (202) 478-2822
Carly.Mee@survjustice.org

**Exhibit 1**



# COURTS & CRIME

http://pilotonline.com/news/local/crime/odu-police-officers-speak-of-thin-staffing-poor-morale/article_32e82c9f-28e2-50d8-8964-7fee634a8906.html

## ODU police officers speak of thin staffing, poor morale

Gary Harki
Feb 25, 2015



Rhonda Harris was named chief in January 2012.

*CORRECTION: Bobby Taylor is retired from the Old Dominion University Police Department's detective division. An earlier version of this story incorrectly reported his status.*

——

NORFOLK

Officers in the short-staffed Old Dominion University Police Department have been forced to work 16- to 18-hour shifts for days at a time, according to police union officials.

About 40 percent of the officer jobs in the department - 23 of its 56 positions - are open. Of the 33 officers employed, 18 patrol campus.

Current and former officers cited staffing and other problems to ODU administrators in letters obtained by The Pilot. It's creating a dangerous environment, wrote John Sandhofer, an ODU officer and president of ODU's chapter of the International Brotherhood of Police.

"The lack of qualified, experienced personnel in this department is creating a toxic atmosphere within the ranks and ultimately a safety hazard for the campus, community and the officers," he wrote to ODU President John Broderick in a letter dated Nov. 5.

Other letters, from a detective who still works at ODU and the department's former training and accreditation officer, outline problems with hiring practices, the detective division and communication and cooperation with the Norfolk Police Department.

Security has been a concern for ODU following a string of violent incidents. Several took place off campus, but in November an ODU student reported that she was raped by three men in her residence hall room.

ODU Police Chief Rhonda Harris and Broderick declined to be interviewed Tuesday through university spokeswoman Giovanna Genard. Norfolk police Chief Mike Goldsmith was in a conference and not available for an interview, said police spokesman Officer Daniel Hudson.

In an emailed statement, Genard said she could not comment on personnel issues but added that the department "is undergoing a revamping of our Public Safety Division and raising its standards - from enhancing hiring practices to strengthening training and utilizing state-of-

the-art technology to combat crime. We are committed to an ongoing process of improvement and greater professionalism."

Many senior officers have left since Harris was named chief in January 2012, some of them forced out, and most have not been replaced, said Mike McKenna, a former Norfolk police officer and a national representative of the International Brotherhood of Police Officers. McKenna, who graduated from ODU, provided the letters to The Pilot.

"Sometimes there are just one or two officers working a shift. That's the concern, officer safety and campus security," he said. "They need more officers."

There's no hard and fast rule for how many officers a department should have, said David Perry, president of the International Association of Campus Law Enforcement Administrators and chief of police at Florida State University.

The general rule used by the International Association of Chiefs of Police recommends 2.2 officers for every 1,000 people.

Under the IACP standard, the department should have roughly 53 officers.

"I don't know why she is not hiring," McKenna said of Harris.

Departments all over the country face hiring challenges, Genard said.

"We recently implemented a continuous hiring process, raised the qualification standards of applicants and have developed a new department-wide training program, to help existing officers with their professional development," Genard said.

This past spring, Nathan Miller left the Newport News Police Department, where he had worked for about a decade, to join ODU's department as its training and accreditation officer.

In a letter dated Feb. 11, Miller said he was leaving ODU's department and returning to Newport News.

"I knew there would be challenges, but I never imagined what I actually walked into," he wrote.

Miller declined to comment for this story.

While staffing levels are "dangerously low," hiring has come to a standstill under Harris, Miller wrote.



"The reputation of the department is making recruiting extremely difficult," he said. "The department isn't even competing on the same field when compared to other departments in Hampton Roads."

Miller wrote that three investigators in the detective unit have less than two years of police experience.

"There is only one true detective in the unit," he wrote.

Bobby Taylor, a retired New York City Police detective who headed ODU's detective division until he retired from there in October, wrote his own letter to Broderick.

Taylor, who has worked for ODU police since 2003, could not be reached for this story.

The division is composed of "three young rookie officers and one detective, besides myself," Taylor wrote in the letter obtained by The Pilot. "Not only do I have to train them to be an investigator (which takes years), I also have to train them first to be a police officer."

Andy Protogyrou, a city councilman and lawyer, said a courthouse official approached him in the fall about an ODU detective's testimony. The official questioned whether the detective understood how to testify, Protogyrou said.

Case 2:17-cv-00015-HCM-DEM Document 1 Filed 01/06/17 Page 32 of 36 PageID# 32

Protogyrou said he personally has seen only professional work from ODU's department.

He talked to Norfolk City Manager Marcus Jones about concerns over how serious crimes would be handled between Norfolk police and ODU police, he said.

The two departments have worked on a new memorandum of understanding that has not yet been signed.

"I was assured by the manager's office that they were going to get those things squared away on the MOU," he said.

Amanda Howie, spokeswoman for the Commonwealth's Attorney's Office, said a memorandum dated April 1, 1993, is in effect between the two departments.

"We're aware there's an ongoing initiative between the city and ODU to update the MOU, and we support that effort," she said.

The city and the university have signed four memorandums of understanding since 1993, the last in 2010, Genard said.

Those memos can address how departments interact with one another, from areas in which departments share jurisdiction to how they investigate major crimes.

Another memorandum that addresses the working relationship between the departments is being drafted, Genard said. ODU police have also signed two memos with the Virginia State Police, she said.

ODU and Norfolk police "enjoy a close partnership... and seek an even closer collaboration - they've stepped up patrols around campus and we assist them in responding to calls near campus, among many other joint initiatives," Genard wrote in a statement.

In his letter, Miller disagreed.

"The once thriving relationship the department enjoyed with Norfolk PD is broken," Miller wrote. "I have experienced firsthand the lack of communication when I have reached out to Norfolk."

Sandhofer, the ODU police union official, requested a meeting with Broderick in the fall. It did not take place.

However, he said, a meeting with ODU Chief Operating Officer David Harnage has been proposed for sometime soon.

*Gary Harki, 757-446-2370, [gary.harki@pilotonline.com](gary.harki@pilotonline.com)*

Share

G+1

---

## Gary Harki

Gary Harki is the database reporter for The Virginian-Pilot.

**SPONSORED: YOU MAY ALSO LIKE**                                    Sponsored Links by Taboola

**43 Lost Historical Photos They Couldn't Show Until Now**
Tailored News

**Here's What Happened When I Tried Dollar Shave Club**
Dollar Shave Club

**99% of Students Get Better Grades Using This Grammar App**
Grammarly

**Sports Bras That Actually Cute (With Extra Support Too!)**
Fabletics

AdChoices▷

12/17/2014          SurvJustice Mail - FW: Office of Institutional Equity and Diversity- report of sexual harassment, sexual misconduct and/or sexual violence

Case 2:17-cv-00015-HCM-DEM Document 1 Filed 01/06/17 Page 34 of 36 PageID# 34



# Exhibit 2

Laura Dunn <laura.dunn@survjustice.org>

---

## FW: Office of Institutional Equity and Diversity- report of sexual harassment, sexual misconduct and/or sexual violence
1 message

---

███████████████████████                                    Mon, Dec 15, 2014 at 2:24 PM
To: Laura Dunn <laura.dunn@survjustice.org>

████████████████████████████████

**Sent:** Thursday, November 06, 2014 12:59 PM

█████████████████

**Subject:** Fwd: Office of Institutional Equity and Diversity- report of sexual harassment, sexual misconduct and/or sexual violence

---------- Forwarded message ----------
From: **Newsom, Lanay** <snewsom@odu.edu>
Date: Thursday, November 6, 2014
Subject: Office of Institutional Equity and Diversity- report of sexual harassment, sexual misconduct and/or sexual violence
████████████████████████████████████

██████████

My name is S. Lanay Newsom and I am the Director, Equity and EO/AA and Deputy Title IX Coordinator in the Office of Institutional Equity and Diversity.  One of the responsibilities of our office is to investigate reports of sexual harassment.   A report of potential sexual harassment, sexual misconduct and/or sexual violence has been made and you are receiving this message because of your direct or indirect involvement.  Old Dominion University and Title IX of the Education Amendments of 1972 prohibits discrimination based on sex.  Sexual harassment has been recognized as a form of sex discrimination in violation of Title IX.

In some cases conduct may constitute both sexual harassment under Title IX and criminal activity.   This might be the case even if the police do not have sufficient evidence of a criminal violation.  Consequently, under the direction of the Title IX Coordinator, ReNeé S. Dunman, the Office of Institutional Equity and Diversity investigates complaints to determine if a violation has occurred and takes measures to resolve them promptly and equitably.

The University's ultimate goal is to ensure the safety and well-being of its students while any fact-finding is in progress.  To meet this goal, you have been provided a number of resources.   Additionally, if you believe you have been sexually harassed you may also file a complaint with our office.  If you wish to file a complaint you may visit the office at 1301 Spong Hall, call the office at 683.3141 or respond to my email.  For your reference the entire complaint procedure and complaint form can be found on our website at http://www.odu.edu/content/dam/odu/policies/university/6000/univ-6320.pdf.


Thank you.



Lanay


S. Lanay Newsom, Esq.

Director, Equity and EO/AA

Office of Institutional Equity and Diversity

Old Dominion University

1301 Spong Hall

Norfolk, VA 23529-0291

757.683.3141

FAX:757.683.5844

Any advice in this communication is limited to the conclusions specifically set forth herein and is based on the completeness and accuracy of the stated facts, assumptions and/or representations included. In rendering our advice, we may consider tax authorities that are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of our advice. We will not update our advice for subsequent changes or modifications to the laws and regulations, or to the judicial and administrative interpretations thereof. The advice or other information in this document was prepared for the sole benefit of KPMG's client and may not be relied upon by any other person or organization. KPMG accepts no responsibility or liability in respect of this document to any person or organization other than KPMG's client.

The information in this email is confidential and may be legally privileged. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on it, is prohibited and may be unlawful. When addressed to our clients any opinions or advice contained in this email are subject to the terms and conditions expressed in the governing KPMG client engagement letter.
****************************************************************



Laura Dunn <laura.dunn@survjustice.org>

# FW: Recall: Office of Institutional Equity and Diversity- report of sexual harassment, sexual misconduct and/or sexual violence

1 message

████████████████████                                        Mon, Dec 15, 2014 at 2:25 PM
To: Laura Dunn <laura.dunn@survjustice.org>


████████████████████████████████

**Sent:** Friday, November 07, 2014 12:08 PM
████████████████
**Subject:** Fwd: Recall: Office of Institutional Equity and Diversity- report of sexual harassment, sexual misconduct and/or sexual violence


---------- Forwarded message ----------
From: **Newsom, Lanay** <snewsom@odu.edu>
Date: Thursday, November 6, 2014
Subject: Recall: Office of Institutional Equity and Diversity- report of sexual harassment, sexual misconduct and/or sexual violence
████████████████████████████

Newsom, Lanay would like to recall the message, "Office of Institutional Equity and Diversity- report of sexual harassment, sexual misconduct and/or sexual violence ".

---

Any advice in this communication is limited to the conclusions specifically set forth herein and is based on the completeness and accuracy of the stated facts, assumptions and/or representations included. In rendering our advice, we may consider tax authorities that are subject to change, retroactively and/or prospectively, and any such changes could affect the validity of our advice. We will not update our advice for subsequent changes or modifications to the laws and regulations, or to the judicial and administrative interpretations thereof. The advice or other information in this document was prepared for the sole benefit of KPMG's client and may not be relied upon by any other person or organization. KPMG accepts no responsibility or liability in respect of this document to any person or organization other than KPMG's client.

---

The information in this email is confidential and may be legally privileged. It is intended solely for the addressee. Access to this email by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on it, is prohibited and may be unlawful. When addressed to our clients any opinions or advice contained in this email are subject to the terms and conditions expressed in the governing KPMG client engagement letter.
****************************************************************************